IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 13-31098 |
| VIRGINIA UNITED METHODIST HOMES | ) | |
| OF WILLIAMSBURG, INC., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF CHRISTOPHER P. HENDERSON IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS OF VIRGINIA
UNITED METHODIST HOMES OF WILLIAMSBURG, INC.**

I, Christopher P. Henderson, being duly sworn, deposes and says:

1. I am the President of Virginia United Methodist Homes of Williamsburg, Inc. ("VUMHW" or the "Debtor"), the above-captioned debtor and debtor in possession.

2. I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor, and I am authorized to submit this Declaration on behalf of the Debtor.

3. On March 1, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court").

4. The Debtor remains in possession of its assets and continues to manage its business as a debtor in possession pursuant to Bankruptcy Code Sections 1107 and 1108.

5. No trustee, examiner, or committee has yet been appointed in this case.

6. The Debtor has filed or anticipates filing the following motions and applications (collectively, the "First Day Motions"):

(a)    Motion of Debtor Pursuant to 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007(C) Requesting an Extension of the Time to File Schedules of Assets and Liabilities, Schedule of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs (the "Schedules Extension Motion");

(b)    Motion of Debtor for Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to the Bond Trustee and (III) Scheduling a Final Hearing Thereon (the "Cash Collateral Motion");

(c)    Motion of Debtor for Interim and Final Order Under 11 U.S.C. §§105, 362, 363, and 364, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001(a)-1 (I) Authorizing Debtor, as Debtor In Possession, to Incur Postpetition Secured Indebtedness, (II) Granting Security Interests and Super-Priority Claims, (III) Modifying Automatic Stay and (IV) Setting Final Hearing ("DIP Motion");

(d)    Motion of the Debtor for Entry of an Order: (A) Authorizing But Not Directing the Debtor to Pay Certain Pre-petition (I) Wages, Salaries, and Other Compensation, (II) Employee Medical and Similar Benefits, and (III) Other Miscellaneous Employee Expenses and Benefits; (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payments Related to the Foregoing (the "Wage Motion"); and (C) Related Relief;

(e)    Motion of the Debtor for Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service to the Debtor, (II) Deeming the Utility Companies Adequately Assured of Future Performance by the Debtor, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utilities Motion");

(f)    Motion of the Debtor for Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Business Forms, and (IV) Maintenance of Existing Investment Practices (the "Cash Management Motion");

(g)    Motion of Debtor for Order Authorizing the Debtor to Maintain Escrow Arrangements in the Ordinary Course and Refund Certain Resident Deposits (the "Entrance Fee Escrow Motion");

(h)    Motion to Permit the Debtor to Self-Report In Lieu of the Court's Appointment of a Patient Care Ombudsman (the "Ombudsman Motion");

(i)    Motion of Debtor for an Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (the "Scheduling Motion");

(j)     Motion of the Debtor for Order (A) Authorizing But Not Directing the Debtor to Pay Pre-Petition Amounts Under Its Insurance Programs and (B) Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Insurance Motion");

(k)     Motion for Order Under 11 U.S.C. §§ 105(A) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Motion");

(l)     Application Pursuant to 11 U.S.C. §§ 521, 28 U.S.C. § 156(C) and Rule 2002 of the Federal Rules of Bankruptcy Procedure for an Order: (A) Authorizing the Debtor to Mail All Notices; and (B) Approving the Form of Agreement with BMC Group, Inc. as Claims, Noticing, and Solicitation Agent of the Bankruptcy Court ("Claims Agent Application");

(m)     Application of Debtor for Order Authorizing Employment and Retention of DLA Piper LLP (US) as Counsel for the Debtor Nunc Pro Tunc to the Petition Date ("DLA Retention Application");

(n)     Application of Debtor for Order Authorizing Employment and Retention of Hirschler Fleischer, P.C. as Counsel for the Debtor Nunc Pro Tunc to the Petition Date ("Hirshler Fleischer Retention Application");

(o)     Application For Entry Of An Order Authorizing Employment And Retention Of McGuireWoods LLP As Special Bond Counsel To The Debtor As Of Petition Date ("McGuireWoods Retention Application");

(p)     Application of Debtor for an Order Pursuant to Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Employ and Retain Deloitte Financial Advisory Services LLP as Restructuring Advisor Nunc Pro Tunc To The Petition Date ("Deloitte Retention Application").

7.     The Debtor further anticipates filing a proposed Chapter 11 Plan of Reorganization (the "Plan") and associated Disclosure Statement (the "Disclosure Statement") concurrently with or shortly following the filing of this case.

8.     I am submitting this Declaration in support of the Debtor's First Day Motions. Capitalized terms used but not defined in this Declaration shall have the meanings set forth in the relevant First Day Motion. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtor's operations and financial condition, and

information provided to me by management, advisors, employees or other representatives of the Debtor. If I were called as a witness, I would testify consistently with the facts set forth in this Declaration.

9.      This Declaration provides an overview of the Debtor and the circumstances leading to the commencement of this Chapter 11 case. Section I provides an overview of the Debtor's operations. Section II recounts the events preceding the bankruptcy filing. Section III affirms and incorporates facts that support the First Day Motions.

## PRELIMINARY STATEMENT

10.     This Chapter 11 case is intended to implement a consensual restructuring that has been fully negotiated by the Debtor, its sponsor Virginia United Methodist Homes, Inc. ("VUMH") and a majority of the Debtor's secured creditors. These negotiations resulted in a term sheet for the restructuring of VUMHW that at least 66% of the Debtor's only third-party class of impaired creditors are contractually bound to support (the "Term Sheet"). The transactions contemplated by the Term Sheet are embodied in the Plan and the Plan was reviewed and commented on by such creditors prior to filing with this Court. The terms of VUMHW's restructuring, as set forth in the Plan, ensure that the rights of the Debtor's residents and its general unsecured creditors will not be affected. Accordingly, the Debtor does not anticipate that this case will be contentious and seeks the Court's assistance in providing for an expeditious exit from Chapter 11 protection.

## I.      Overview of the Debtor's Business

### A.      Description of VUMHW's Continuing Care Retirement Community.

11.     VUMHW's continuing care retirement community, which began limited operations in May 2007 and full operations in June 2008, is located on a leased 105 acre parcel of real property owned by VUMH (the "Property," and together with the buildings and

improvements owned by VUMHW and located thereon, the "CCRC"). VUMH, a Virginia non-profit corporation, is the sole member of VUMHW. Under the bylaws of VUMHW (as amended, the "Bylaws"), the President of VUMHW must be the same person as the President of VUMH, and at least four (4) of the six (6) members of VUMHW's Board of Directors must also be current or immediate-past members of the VUMH Board of Directors. Additionally, VUMHW's budget and other significant financial activities are subject to approval of the VUMH Board of Directors.

12.     The CCRC offers seniors a continuum of care in a campus-style setting, providing living accommodations and related healthcare and support services to a target market of upper-middle-class-income seniors aged sixty-two (62) years and older. The CCRC enables seniors to remain at the same location while adapting to changing needs for healthcare services by providing various levels of support and care.

13.     The CCRC currently includes:  (a) 181 independent living units (of which 85 are apartments and 96 are villas) with an approximately 80% occupancy rate; (b) 14 assisted living apartments with an approximately 65% occupancy rate; and (c) 12 skilled nursing beds with an approximately 75% occupancy rate.

14.     VUMHW was formed in 2003 and subsequently received a determination letter from the Internal Revenue Service as to VUMHW's non-profit status, setting forth VUMHW's exemption from federal income taxation under Section 501(a) of the Internal Revenue Code as an organization described in Section 501(c)(3) of the Internal Revenue Code.

**B.    Development of VUMHW.**

15.     VUMHW was developed by entering into a lease agreement for the Property with VUMHW, raising funds of $114,270,000 in the form of variable and fixed rate bond debt (both tax-exempt and taxable) to finance the development and construction of the CCRC, and

becoming fully operational for resident occupancy after June 2008.

### i.      The Lease Agreement.

16.      VUMHW currently leases the Property from VUMH pursuant to a fifty (50) year ground lease agreement entered into as of July 1, 2007 (the "Lease Agreement"). The Lease Agreement expires on July 1, 2057, but provides for five automatic ten-year extensions, allowing the Lease Agreement to continue until 2107, unless earlier terminated. Rental payments under the Lease Agreement consist of a base of approximately $325,000 per year adjusted annually based on the percentage increase in the Consumer Price Index against the previous year, in addition to quarterly payments of "Additional Rent." Additional Rent is calculated based on the number of occupied units on the property. VUMHW maintains ownership of all equipment, buildings, and other improvements on the Property during the term of the Lease Agreement and has an option to purchase the real property from VUMH at any time for the applicable current fair market value of the real property. VUMHW has been unable to make rental payments since fiscal year 2008.

### ii.      Pre-Petition Capital Structure.

17.      VUMHW entered into a bond financing agreement with the Economic Development Authority of James City County, Virginia (the "Authority"), to borrow the proceeds of the Authority's issuance of $114,270,000 Residential Care Facility Revenue Bonds, Series 2007A, 2007B, and 2007C (the "Bonds") pursuant to a bond indenture (the "Bond Indenture") and a master indenture (the "Master Indenture"). UMB Bank, N.A. currently serves as the master trustee (the "Master Trustee") and the bond trustee (the "Bond Trustee", and together with the Master Trustee, the "Trustee") in connection with the Bonds.

18.      The Bonds are secured by a pledge of VUMHW's revenues, a leasehold deed of trust on the Property, and a security agreement with respect to the equipment of the VUMHW

facility.  The terms of the Bonds are as follows:

    a.    Series 2007A:  Fixed rate bonds, issued in the original principal amount of $43,325,000 and at a discount of $302,353 with interest rates between 5.15% and 5.50%.

    b.    Series 2007B:  Adjustable rate bonds, issued in the original principal amount of $5,000,000.

    c.    Series 2007C:  Variable rate bonds backed by a letter of credit issued in the original amount of $65,945,000.  As of February 19, 2013, the aggregated outstanding principal amount of Series 2007C Bonds was $15,283,378.08.  The Bank was the issuer of the letter of credit..  In order to facilitate the restructuring of the Bonds, prior to the Filing Date, the Bank initiated a mandatory tender of the Series 2007C Bonds which resulted in a draw under the letter of credit and a full payoff of the Series 2007C Bonds.  Immediately thereafter, the Bank sold all of its claims against the Debtor in respect of the draw under the letter of credit and under the Letter of Credit Agreement, dated as of July 1, 2007.

    iii.    <u>Construction.</u>

19.    The construction of VUMHW's campus and facilities was started in the summer of 2007 and the CCRC was ready for full operations in June of 2008.  The issuance of the Bonds covered the primary cost of construction of the project and the funding of certain reserves held by the Trustee.  In order to facilitate VUMHW's ability to pay for the cost of construction, VUMH deferred the collection of certain lease payments under the Lease Agreement, totaling more than $1.3 million, deferred the collection of certain administrative services fees, totaling more than $1.5 million, and made a series of subordinated loans to VUMHW in the approximate amount of $20 million, including accrued and unpaid interest to date.

**C.    Management of the CCRC.**

20.    The business operations of the CCRC are managed by VUMH pursuant to the Bylaws and VUMH provides administrative services pursuant to an Administrative Services Agreement (the "<u>Administrative Services Agreement</u>") with VUMHW.  VUMH owns and operates other continuing care and residential care facilities in Virginia, including:

a.      Roanoke United Methodist Home located in Roanoke, Virginia;

b.      Hermitage on the Eastern Shore located in Onancock, Virginia;

c.      Hermitage in Northern Virginia located in Alexandria, Virginia;

d.      The Hermitage in Richmond located in Richmond, Virginia;

e.      The Hermitage at Cedarfield located in Richmond, Virginia; and

f.      Lydia H. Roper Home located in Norfolk, Virginia.

21.     Under the Administrative Services Agreement, VUMH provides for: (i) the completion, development and construction of the facility ("Development Services"), (ii) administrative, payroll, human resource assistance services ("Basic Services"), (iii) communications, excellence practices, and strategic planning and implementation assistance services ("Leadership Services"), and (iv) policy and research services ("Research Services").

22.     The Administrative Services Agreement requires VUMHW to pay a Basic Services Fee and an Affiliation Services Fee. The Basic Services Fee is paid on a monthly basis and is calculated based on the actual costs expended by VUMH, including salaries, expenses, and other overhead costs directly related to providing quantifiable services to VUMHW. The Affiliation Services Fee is paid quarterly and is an additional fee of thirty percent (30%) of the Basic Services Fee paid each month during the previous quarter. Although the Affiliation Services Fee is to be paid on a quarterly basis, payment is subordinated to VUMHW's long term debt service obligations. Further, the Administrative Services Agreement was set at a maximum amount of $420,000 per year during fiscal years 2008 through 2010, and thereafter is capped at 4% of the annual gross revenue of VUMHW. Amendment of the Administrative Services Agreement is permitted by mutual agreement of

the parties.   VUMHW has deferred paying all services fees since the inception of the

Administrative Services Agreement.

### D.    Residents of the CCRC.

        i.    Residency Agreements.

23.    Prior to a resident occupying an independent living unit in the CCRC, such

resident enters into a residency agreement and related agreements (each a "Residency

Agreement") with VUMHW.  The Residency Agreement encompasses the terms and conditions

under which the resident will occupy a unit, including outlining the obligations for the payment

of entrance fees (each, an "Entrance Fee"), the ability to obtain a refund of that entrance fee, the

amount of monthly service fees to be charged and related general matters.

24.    Under the Residency Agreement, except as discussed herein, a prospective

resident must pay an Entrance Fee prior to occupying the unit.  Typically, the resident pays a

10% fully refundable deposit at the time of signing the Residency Agreement and pays the

remaining 90% once a unit is ready for a resident to occupy.  The Entrance Fee is a fixed amount

that cannot be increased at the time of admission except as specifically stated in the Residency

Agreement.  If a resident chooses to vacate the CCRC or is deceased, a portion of the Entrance

Fee is refundable sixty (60) days after (i) a resident leaves the CCRC, (ii) the re-occupancy of

that resident's unit and (iii) the receipt of a new entrance fee for that unit.  The terms of any

refund rights are outlined in the Residency Agreement and related documents.

25.    In certain circumstances and on a case-by-case basis, VUMHW provides a

prospective resident the option of deferring the payment of their Entrance Fee for up to six (6)

months in order to allow that resident to obtain the funds necessary to pay the Entrance Fee.

This optional deferral is typically offered in circumstances such as when a resident has been

unable to sell their existing home and requires funds from the sale in order to pay the Entrance

Fee. This optional deferral program is an integral part of VUMHW's ability to attract interested and eligible residents to the CCRC and for VUMHW to achieve its occupancy targets. Accordingly, VUMHW intends to continue to offer an optional deferral program on a case-by-case basis both during the pendency of this Chapter 11 case and following emergence from Chapter 11 protection.

26.    In addition to the Entrance Fee, VUMHW charges monthly service fees (the "Monthly Service Fees"), with the amount depending on the type of unit and whether the unit is subject to single or double occupancy.

27.    Monthly Service Fees are periodically adjusted as provided for in the Residency Agreement. There are no specific limitations on the increase in Monthly Service Fees.

28.    As discussed in greater detail in section II below, on September 19, 2012, VUMHW began to voluntarily defer from collecting Entrance Fees. Certain of the deferred Entrance Fees, once received by VUMHW, will trigger refund obligations to certain former residents.

E.    **Regulatory Agencies.**

29.    The continuing care retirement community industry nation-wide is heavily-regulated by various state and federal agencies. Each state has a different regulatory regime in this area, particularly with respect to disclosure of financial statements, solvency of the facility, maintenance of a certain amount of reserves, and the refunding of fees and deposits. As a continuing care retirement community operating in the Commonwealth of Virginia, VUMHW is regulated by the Commonwealth of Virginia Department of Social Services, the Commonwealth of Virginia Department of Health, the Virginia State Corporation Commission ("SCC") and the United States Department of Health and Human Services' Centers for Medicare and Medicaid

Services.

## II.    Events Leading to Chapter 11

30.    The CCRC was completed and ready for occupancy during the summer of 2008, unfortunately precisely as the housing market in the United States began to experience an unprecedented collapse.  Following the 2008 economic downturn and corresponding real estate market decline, large numbers of homeowners were (and continue to be) unable to sell their homes without a substantial loss in value.  Seniors interested in moving to a continuing care retirement community typically sell their existing homes and use the positive equity to fund the required entrance deposit.  Furthermore, the decline in the financial markets has resulted in many seniors having substantially smaller retirement savings than they had originally anticipated.  The severe and protracted real estate market downturn resulted in a drastic and proportional decline in the ability of many communities, including the CCRC, to sell units to prospective residents.  Accordingly, although VUMHW has been fully operational since 2008, the housing market has limited its ability to achieve a stabilized occupancy rate in the independent living sections of the CCRC.  As occupancy is the foundation of VUMHW's business, its inability to achieve stabilized occupancy eventually resulted in VUMHW determining that it would be unable to refinance or repay in cash its obligations under the 2007 Letter of Credit Agreement coming due on December 31, 2012.

31.    Accordingly, prior to filing this case, VUMHW engaged in extensive negotiations with the Banks, UMB Bank, as trustee for the holders of the Bonds and various institutional holders.

32.    Specifically, after voluntarily deferring collection of Entrance Fees on September 19, 2012, VUMHW began discussing restructuring options with the Banks.  VUMHW held a

number of "all-hands" meetings at the offices of Hirschler Fleischer, P.C. in Richmond and at the

offices of DLA Piper in Baltimore, with counsel, financial advisors, and business representatives

from each of the parties participating in order to evaluate whether and to what extent VUMHW

would be able to restructure its bond obligations. Following productive meetings and continued

discussions, and in order to facilitate in-depth financial discussions among the parties, on

December 3, 2012, VUMHW entered into continuing non-disclosure agreements (the "NDA")

with certain holders of approximately 66% of the outstanding principal amount of the Series

2007A Bonds and Series 2007B Bonds (the "Consenting Bondholders").

33.     Thereafter, VUMHW and the Consenting Bondholders negotiated a restructuring

of VUMHW's secured and certain unsecured obligations, including the Bonds, which was

embodied in the Term Sheet and the Plan. On February 13, 2013, VUMHW and the Consenting

Bondholders entered into a Restructuring, Lockup, Plan Support and Forbearance Agreement

(the "Lockup Agreement") that provides for the Consenting Bondholders to support VUMHW's

proposed Plan. Further, as part of the negotiation among the parties, and in order to facilitate the

restructuring of VUMHW's bond indebtedness, prior to the filing of this Chapter 11 case, the

Banks commenced a mandatory tender of the Series 2007C Bonds pursuant to which the Banks

purchased the Series 2007C Bonds, the Bank's letter of credit was drawn to pay the holder of

such bonds in full and VUMH purchased the Banks' claims against the Debtor in respect of such

letter of credit draw at a significant discount. By doing so, VUMH has stepped into the shoes of

the Banks and has agreed to a substantial reduction of such claims under the Plan. In addition,

VUMH has agreed to various concessions and financial support arrangements for VUMHW that

will be effectuated through the Plan, including providing debtor in possession financing during

the pendency of this case on terms more favorable to the Debtor than it could obtain from a third

party lending source, transferring the Property to the Debtor, forgoing all subordinated indebtedness from VUMHW to VUMH, providing a revolving loan facility to supplement available liquidity after VUMHW emerges from bankruptcy, and pledging to provide VUMHW with a capital contribution of $1.5 million and a $2 million senior secured loan on or around the Effective Date to fund VUMHW's operations post-bankruptcy.

34.    Accordingly, as a result of the significant amount of time spent by the parties prior to filing this case, VUMHW has filed or intends shortly to file a Plan and Disclosure Statement with this Court, embodying a consensual restructuring that provides for the protection of all residents' rights and payment of all trade debt.

## III.    Facts in Support of First Day Motions

35.    Contemporaneously with the filing of its Chapter 11 petition, the Debtor has filed the First Day Motions.  The Debtor requests that each of the First Day Motions described below be granted, as they constitute a critical element in ensuring the Debtor's successful reorganization in this Chapter 11 case.

### A.  Schedules Extension Motion

36.    By the Schedules Extension Motion, the Debtor requests that the Court enter an order extending the time by which the Debtor must file its Schedules and Statements until the 45th day after the Petition Date (the "Schedules and Statements Filing Deadline") or the Disclosure Statement Hearing, whichever is earlier.

37.    Given the substantial burdens already imposed on the Debtor's management by the commencement of this Chapter 11 case, the prepetition negotiation and preparation of the proposed Plan, and the expected short time frame for this case, VUMHW's management requires additional time to complete the schedules and statements required under the Bankruptcy Code in the time frame provided by the Bankruptcy Rules.  Furthermore, since the financial advisors for

13

the Consenting Bondholders have been performing financial due diligence for several months, and neither unsecured trade creditors nor residents' rights will be affected by the Plan, the need for timely schedules is lessened. Accordingly, there is reasonable justification to provide VUMHW additional time to meet these requirements, through and including the 45th day following the Petition Date and I therefore believe that "cause" exists to extend the deadline, as such term has been explained to me by VUMHW's legal professionals.

### B. Cash Collateral Motion

38.    By the Cash Collateral Motion, the Debtor requests the entry of the Interim Order and the Final Order (i) authorizing the use of cash collateral, (ii) granting adequate protection and related security interests, and (iii) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b).

39.    In the ordinary course of business, the Debtor requires cash on hand and cash flow from its operations to fund its working capital and liquidity needs. In addition, the Debtor requires cash on hand to fund this Chapter 11 case while seeking to reorganize its business. Post-petition use of the Cash Collateral is necessary in order for the Debtor to preserve sufficient liquidity to maintain ongoing day-to-day operations and fund its working capital needs. Due to the nature of the Debtor's business and the impact that a prolonged Chapter 11 case would have on the Debtor's residents, it is imperative that the Debtor have the necessary cash on hand to successfully reorganize pursuant to the proposed Plan as quickly as possible.

40.    All of the Debtor's deposit accounts, cash and cash proceeds are encumbered by security interests in favor of the Master Trustee under the Master Indenture entered into in connection with the Bonds, and, as such, constitute "cash collateral" (as such term is defined in Bankruptcy Code Section 363(a), "Cash Collateral") of the Master Trustee. The Debtor has an emergency need for the immediate use of Cash Collateral to effectively and expeditiously

manage this Chapter 11 case. Absent the use of Cash Collateral, the Debtor will be forced to exhaust its DIP facility (as discussed herein) and will lack the ability to ensure ongoing operations of its business. In recognition thereof, the Trustee has agreed to the use of Cash Collateral by the Debtor on terms that are usual and customary. Those terms were negotiated at arm's-length, with all parties represented by counsel, and are fair and reasonable under the circumstances.

41.     The Debtor has submitted with the Cash Collateral Motion a proposed interim order granting the relief requested and permitting the use of cash collateral (the "Interim Order"). Attached to the Interim Order is a detailed operating budget for the use of the cash collateral (the "Budget").

42.     The Interim Order sets forth certain stipulations and agreements by VUMHW regarding, *inter alia*, (a) the validity and enforceability of the bond financing documents, (b) the validity and enforceability of the VUMHW's obligations in connection with the Bonds and bond financing documents, and (c) the validity and enforceability of the Master Trustee's liens on and security interests in VUMHW's "Gross Receipts", "Pledged Assets" and "Mortgaged Premises" (each as defined in the Master Indenture). Each of the stipulations and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

43.     As adequate protection for VUMWH's use of the Master Trustee's Cash Collateral, VUMHW has agreed to provide the Master Trustee with certain replacement liens, super-priority administrative claims, and expense reimbursements, each as set forth in the Cash Collateral Motion and the Interim Order. I believe that the adequate protection proposed under the Cash Collateral Motion is warranted and appropriate.

44.   The Cash Collateral Motion and Interim Order address and describe certain accounts that were established in connection with the issuance of the Bonds and are held by the Master Trustee and the Bond Trustee, respectively (collectively, the "Trustee-Held Funds"). Pursuant to the bond financing documents, including the Master Indenture and Bond Indenture, the Trustee-Held Funds are held in trust for the benefit of the holders of the Bonds, and may be used only for the purposes enumerated under the bond financing documents.

45.   I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtor, its estate and its creditors, and absent such relief, the Debtor will experience immediate and irreparable harm and its reorganization efforts will be jeopardized.

### C.   DIP Motion

46.   In order to provide liquidity to the Debtor so that it may meet its obligations to pay, among other things, professional fees and resident Entrance Fee refunds that may come due during this case, VUMH has agreed to provide the Debtor with debtor in possession ("DIP") financing during the pendency of this case.  The DIP financing provides the Debtor with total availability of approximately $3,000,000 million, of which $1,000,000 will be available on an interim basis.  The terms of the DIP financing have been consented to by the Consenting Bondholders and the Trustee.  The terms of the DIP financing are more favorable to the Debtor than those generally available in the market for such financing and the Debtor believes that it could not obtain more favorable terms from any third-party lender.

### D.   Wage Motion

47.   By the Wage Motion, VUMHW is requesting the entry of an Order to: (a) authorize, but not direct, the Debtor to pay certain pre-petition (i) wages, salaries, and other compensation, (ii) employee medical and similar benefits, and (iii) other miscellaneous employee expenses and benefits; and (b) authorize and direct financial institutions to receive,

process, honor, and pay all checks presented for payment and electronic payments requests relating to the foregoing.

48.     VUMHW provides the following wages and benefits to its employees:

    (i)     Wages, salaries, bonuses and other compensation;

    (ii)    Employee benefits, including, but not limited to:

        (a)     Medical and dental insurance;

        (b)     COBRA benefits;

        (c)     Life and long-term disability insurance;

        (d)     Short-term disability insurance; and

        (e)     A tax sheltered 403(b) plan;

    (iii)   Workers' compensation insurance and related obligations;

    (iv)    Payroll taxes and other withheld amounts;

    (v)     Paid vacation or "Paid Annual Leave;" and

    (vi)    Miscellaneous employee-related obligations.

49.     VUMHW's employees are essential to the orderly and successful reorganization of the Debtor.  They have an intimate knowledge of the operation of the Debtor's business and any deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact the Debtor, the value of its assets and business, and ultimately its ability to reorganize.  Accordingly, I believe that the ability to compensate the Debtor's employees in the ordinary course of business is critical to the Debtor's reorganization efforts.

50.     In addition, I believe that all unpaid, pre-petition compensation (which includes wages and salaries, but not vacation pay) is entitled to priority treatment in accordance with Bankruptcy Code Section 507(a)(4) in light of the fact that none of the Debtor's employees are owed more than $11,725 in unpaid compensation.

51.     Furthermore, pursuant to state laws, the Debtor must maintain its workers' compensation obligations to ensure prompt and efficient payment and/or reimbursement of its employees. If the Debtor fails to maintain such obligations, it will likely be prohibited by state law from operating in the state. As a result, I believe that payment of all amounts related to the Debtor's workers' compensation obligations is crucial to the continued operation of its business.

52.     For these reasons, and for the reasons and legal arguments set forth in the Wage Motion, I believe that the relief sought in the Wage Motion should be granted.

### E. Utilities Motion

53.     By the Utilities Motion, VUMHW is requesting interim and final orders to: (i) prohibit utilities from altering, refusing, or discontinuing service to VUMHW; (ii) deeming the utility companies adequately assured of future performance by VUMHW; and (iii) establishing procedures for determining requests to VUMHW for additional adequate assurance.

54.     In the ordinary course of business, VUMHW obtains gas, water, sewer, electric, data, telephone, cable, and other similar utility services from approximately thirteen utility providers (the "Utility Providers"). On average, VUMHW spends approximately $47,000 each month for utility services.

55.     At all relevant times, VUMHW has attempted to remain current with regard to its utility bills. To the best of my knowledge, VUMHW is current on all amounts owing to the Utility Providers, other than payment interruptions that may be caused by the commencement of this Chapter 11 case.

56.     I believe that uninterrupted utility services are essential to the ongoing operations of VUMHW, and therefore, to the successful resolution of this case. Any interruption of utility services, even for a brief period of time, would negatively affect VUMHW's operations,

including its ability to provide essential health care services to certain of its residents, thereby seriously jeopardizing VUMHW's reorganization efforts and, ultimately, recoveries for its creditors. It is therefore critical that utility services continue uninterrupted during this Chapter 11 case.

57. VUMHW proposes to put an amount equal to one months' worth of payments to the Utility Providers ($47,000) into a separate account (the "Utility Deposit Account") to be held for the exclusive purpose of paying the Utility Providers. VUMHW submits that the establishment of the Utility Deposit Account, in conjunction with VUMHW's ability to pay for future utility services in the ordinary course of business, constitutes adequate assurance of payment to the Utility Providers.

58. VUMHW expects to have access to Cash Collateral and/or debtor in possession financing, which means that it will have liquidity sufficient to keep its utility obligations current.

59. Finally, VUMHW proposes to protect the Utility Providers by establishing the Procedures provided in the Utilities Motion, whereby any Utility Provider can request additional adequate assurance in the event that it believes there are facts and circumstances with respect to its providing post-petition services to VUMHW that would merit greater protection.

60. Therefore, I believe that the Utility Providers have adequate assurance of future performance, and the relief sought in the Utility Motion should be granted.

## F. Cash Management Motion

61. By the Cash Management Motion, VUMHW seeks entry of an order granting the following relief:

(a)    Authorizing VUMHW to continue to use the VUMHW Cash Management System (defined below), subject to any modification or other relief granted by order of this Court relating thereto, including the following:

(i)    the continued use of the existing Bank Accounts (defined below) with the same names and account numbers as such Bank Accounts existed immediately prior to the Petition Date (with the option of streamlining the Cash Management System by closing or consolidating Bank Accounts);

(ii)    the ability of VUMHW to deposit funds into and withdraw funds from any of the Bank Accounts (subject to available funds or, in the case of zero balance accounts, subject to the availability of funds in the applicable linked funding accounts) by all usual means, including but not limited to checks, wire transfers, electronic funds transfers and other debits;

(iii)    the ability of VUMHW to otherwise treat the Bank Accounts, along with any accounts opened post-petition, for all purposes as debtor in possession accounts;

(iv)    the waiver of any requirements to establish separate accounts for cash collateral;

(v)    authorizing and directing the VUMHW Banks (defined below) to maintain, service and administer such deposit accounts or investment accounts, without interruption and in the ordinary course of business, in accordance with applicable non-bankruptcy law and the account agreements and/or other service documentation between the applicable VUMHW Banks and VUMHW relating to such accounts;

(vi)    authorizing the VUMHW Banks to charge and collect, and authorizing but not directing VUMHW to pay, the pre-petition and post-petition service charges and other fees and expenses to which the VUMHW Banks are entitled under the terms of its account agreements and/or other service documentation with VUMHW;

(b)    Authorizing VUMHW to continue to use its existing business forms without alteration or change; and,

(c)    Authorizing VUMHW to maintain its existing investment practices and waiving the requirements of Section 345(b) of the Bankruptcy Code as to the VUMHW Cash Management System.

62.    I believe that by using the existing Bank Accounts and investment practices,

VUMHW will avoid unnecessary expense and delay, which will disrupt the ordinary financial

affairs and business operations of VUMHW, delay the administration of VUMHW's estate, and increase the costs to the estate.

63.    Prior to the Petition Date and in the ordinary course of business, VUMHW maintained a centralized cash management system through which funds were collected into an operating account and disbursed to various other accounts to pay operating expenses, with excess funds being invested (the "VUMHW Cash Management System").

64.    The VUMHW Cash Management System employs a series of financial accounts, including a centralized operating account maintained at Union First Market Bank ("Union") that receives cash from various sources.  The cash maintained in the operating account is used to fund VUMHW's day-to-day operations, including payroll, employee benefits, payments to vendors and other accounts payable.  The account is an interest bearing account in which interest is paid on the full ledger balance.  Union typically only offers this type of account to large non-profit organizations and currently pays higher interest rates on deposit funds than a transition money market or other repurchase agreement swap.

65.    As of the Petition Date, the VUMHW Cash Management System utilized a combination of operations bank accounts (collectively, the "Bank Accounts") with Union (collectively with any other institutions with which VUMHW maintains or establishes deposit accounts or investment accounts, the "VUMHW Banks").  The Bank Accounts are described in detail below:

      (i)      Operating Account: This account (Acct. No. ending in 1303) serves as the Debtor's checking account.  Resident monthly service fees, Medicare reimbursement and other resident fee deposits are made into this account.  Accounts payable, payroll and debt service obligations are paid through this account.

      (ii)     Reservation Deposit Account: Prior to the Petition Date, this account (Acct. No. ending in 1287) held 10% deposits from prospective residents.  When prospective residents moved into VUMHW, the 10%

deposits were transferred to another account known as the "EF Kept for VUMHW or Transfers." If prospective residents canceled their reservation, the 10% deposits were transferred into the Operating Account for purposing of disbursing refund checks. On and after the Petition Date, and in order to comply with Virginia law, the 10% deposits were transferred to a separate escrow account maintained in the name of VUMHW at Branch Banking & Trust Company pursuant to an escrow account.

(iii)    <u>Future Resident Account</u>: This account (Acct. No. ending in 1295) holds the $1,000 deposits that prospective residents pay to keep their names on the reservation list for the future. If prospective residents request refunds or move-in, the $1,000 deposits are transferred into the Operating Account for purposing of cutting refund checks.

(iv)    <u>Entrance Fees Kept for Refunds Account</u>: This account (Acct. No. ending in 4853) holds certain resident health care fees. Pursuant to VUMHW residency agreements, VUMHW retains two (2) years' worth of daily health care fees of residents who permanently transfer from independent living to either assisted living apartments or a health center suite. VUMHW has the option to draw from this account should the resident not possess other means to pay for their health care needs. Furthermore, should the resident either move out or pass away, the funds are transferred into the Operating Account for purposing of refunding the resident the remaining balance.

(v)    <u>Entrance Fees Kept for VUMHW or Transfers Account</u>: Prior to the Petition Date, this account (Acct. No. ending in 4861) held entrance fees and monies to be transferred to the Master Trustee for certain debt service payments, or retained by VUMHW subject to certain approvals. On and after the Petition Date, the Entrance Fee Escrow Motion supersedes this process. As such, entrance fees collected by certain residents will be transferred into the UMB Bank Escrow Account and governed accordingly.

(vi)    <u>Resident Medicare Account</u>: VUMHW is legally required to utilize this account (Acct. No. ending in 4796) for the purpose of holding certain monies for Medicare residents.

(vii)    <u>Samaritan Account</u>: This account (Acct. No. ending in 3064) holds temporarily restricted Samaritan contributions.

(viii)    <u>Professional Fees Account</u>: Prior to the Petition Date, this account (Acct. No ending in 3137) held accrued but unpaid professional fees, segregated weekly according to the Debtor's short-term cash flow budget, and disbursed to the Debtor's professionals upon receipt of invoices. The Debtor will continue to segregate funds weekly on and

after the Petition Date, and will disburse payments subject to Court Order.

66.     VUMHW manages its cash receipts, transfers and disbursements through one or more of the VUMHW Bank Accounts.  In doing so, VUMHW routinely deposits, withdraws and otherwise transfers funds to, from and between the VUMHW Bank Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. On a daily basis, VUMHW processes large numbers of transactions via the VUMHW Cash Management System.   VUMHW maintains current and accurate records of all transactions processed through the VUMHW Cash Management System.

67.     The VUMHW Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity.   Among other benefits, the VUMHW Cash Management System permits VUMHW to accurately monitor cash availability at all times.  The VUMHW Cash Management System also permits VUMHW to centrally manage and track the collection and transfer of funds, including intercompany transfers, which reduces administrative burden and expense and maximizes interest income.

68.     In addition to the VUMHW Cash Management System and the VUMHW Bank Accounts, VUMHW uses in the ordinary course of its business numerous business forms (including but not limited to checks, deposit slips, letterhead, contracts, purchase orders and invoices).  VUMHW has a supply of these forms on hand.  It would be expensive and wasteful, and disruptive to VUMHW's business to destroy all of these forms and order new ones.

69.     Contemporaneously with the filing of the VUMHW Cash Management Motion, VUMHW has filed other motions seeking authority to pay certain pre-petition obligations, including obligations to employees and other entities.  With respect to certain of these pre-petition obligations, VUMHW already has issued, in the ordinary course of business, checks and

other debits that have yet to clear the banking system. In other instances, VUMHW will issue checks or other debits post-petition on account of the pre-petition obligations once the Court has entered an appropriate order permitting VUMHW to do so. VUMHW intends to inform the VUMHW Banks which pre-petition checks and other debits should be honored pursuant to orders of the Court authorizing such payment.

70.    I believe that the relief requested in the VUMHW Cash Management Motion will help to ensure VUMHW's orderly entry into Chapter 11 protection and will avoid many of the possible disruptions and distractions that could divert VUMHW's attention from more pressing matters during the initial days of this Chapter 11 case, particularly in light of the limited amount of time VUMHW expects to be under Chapter 11 protection.

71.    Given the size and complexity of VUMHW's business operations, any disruption of its accounting and cash management procedures would be enormously burdensome and disruptive, and could adversely impact VUMHW's efforts to reorganize. At this critical juncture, VUMHW must be able to conduct "business as usual" to the extent possible. To this end, it is essential that VUMHW be permitted to continue using its existing VUMHW Cash Management System and the VUMHW Bank Accounts.

72.    Historically, all excess funds of VUMHW have been maintained in interest-bearing domestic bank accounts insured by the United States (through the FDIC) or invested through low risk investment accounts. The investment of VUMHW's excess funds is managed exclusively through the VUMHW Cash Management System. Although VUMHW's investment practices may not strictly comply in all respects with the guidelines identified in Section 345 of the Bankruptcy Code, VUMHW's investments are nevertheless safe, prudent and designed to yield the maximum reasonable return on the funds invested, taking into account the

safety of such deposits and investments. Accordingly, VUMHW requests authority to maintain its existing investment practices and a waiver of the requirements of Section 345(b) of the Bankruptcy Code.

73.     VUMHW has a complex cash management system that provides VUMHW with the ability to transfer funds rapidly to ensure its safety and to maximize its investment value. VUMHW and its estate will receive significant benefit from the continued investment of excess funds. In light of these factors, I believe that VUMHW should be permitted to maintain its investment practices.

### G. Entrance Fee Escrow Motion

74.     By the Entrance Fee Escrow Motion, VUMHW seeks authority to escrow all Entrance Fees collected postpetition as well as keep all Entrance Fees escrowed as of the Petition Date in the existing escrow accounts in order to provide assurance to existing and new residents that VUMHW's Chapter 11 case will not affect the residents' rights to a refund. VUMHW proposes to escrow the Entrance Fees pending confirmation of a plan of reorganization or such other order of this Court.

75.     A resident's willingness to pay the Entrance Fee to VUMHW is necessarily dependent upon such resident's conviction that VUMHW's Chapter 11 case will not negatively affect the refundability of the Entrance Fee or care and service obligations due under the Residency Agreement. Any negative publicity suggesting that a community is in bankruptcy will necessarily deter prospective residents from entering into the new Residency Agreements that are the precursors to VUMHW's receipt of future Entrance Fees.

76.     The relief requested with respect to the Entrance Fees should be granted because the Entrance Fees required under the Residency Agreements are critical to VUMHW's operations. The Entrance Fees account for a significant portion of VUMHW's annual operating

budget and the collection of such amounts is critical to VUMHW's ability to reorganize. Providing the relief requested in the Entrance Fee Escrow Motion maintains the status quo pending a resolution of this case.

77.    During the pendency of this case, VUMHW seeks to refund Entrance Fees to residents in the ordinary course of business and as provided in the Residency Agreements as new Entrance Fees are collected into the escrow.  Additionally, upon confirmation of a plan, the Entrance Fees will be transferred to the reorganized Debtor or such other party as directed by this Court.  Several residents are currently awaiting refunds and they would suffer hardship were they required to continue to wait before such refunds are paid.

78.    I believe it will have a negative effect on VUMHW's operations if it cannot guarantee potential purchasers that their Entrance Fees will be escrowed during the pendency of this case.  Accordingly, VUMHW seeks authorization to escrow all Entrance Fees received post-petition (as well as keep Entrance Fees currently escrowed in the existing escrow account) and protect the residents' interest with respect thereto.  VUMHW has been in frequent contact with the SCC and has kept them advised of actions in this regard.

### H. Ombudsman Motion

79.    By the Ombudsman Motion, the Debtor seeks permission to self-report in lieu of the Court's appointment of a patient care ombudsman.  Given the facts of this case, the appointment of a patient care ombudsman is unnecessary for the protection of patients, as the Debtor's business is not a traditional healthcare business and only a small portion of its activities relate to the actual provision of health care services.

80.    Moreover, the Debtor has an exemplary history of patient care.  There are adequate internal safeguards and patients have the ability to protect their rights, if necessary,

by lodging complaints with the relevant state agencies. Finally, this bankruptcy case is wholly unrelated to (and will not impact) the patient care currently provided at VUMHW.

81.     The Debtor has received no complaints from either the Department of Social Services or the Department of Health with respect to its patient care history.

82.     The Virginia Long Term Care Ombudsman Program protects the rights of older persons who live in long term-care facilities. The program protects and promotes the rights and the quality of life for people who reside in long-term care facilities through regional ombudsmen and volunteers who have a hands-on working relationship with the staff and residents of the facilities within their program areas. The Debtor receives monthly visits from the volunteer ombudsman for Assisted Living and has received no negative remarks or complaints from the ombudsman.

83.     The Debtor is willing to self-report information with respect to these issues in a detailed and rigorous manner, disclosing information in excess of the reporting that would be made by a patient care ombudsman. Accordingly, the Ombudsman Motion is in the best interests of the Debtor, its estate and its creditors.

**I.   Scheduling Motion**

84.     By the Schedule Motion, the Debtor seeks an order of this Court establishing certain notice, case management and administrative procedures and scheduling certain hearings.

85.     As the result of its prepetition negotiation with majority constituencies, the Debtor expects to file its prenegotiated proposed Plan within three (3) business days after the Petition Date. A fundamental part of the terms of that proposal includes the Debtor's ability to expeditiously confirm the proposed Plan and emerge from Chapter 11 protection. Accordingly, the Debtor requests that this Court enter an order, among other things, setting the

date and time for hearings to consider approval of the Debtor's Disclosure Statement and Confirmation of the Plan. Specifically the Debtor requests hearings on or about the following dates, with corresponding objection deadlines:

- Disclosure Statement Hearing: April 10, 2013
- Disclosure Statement Objection Deadline: April 3, 2013 at 4:00 p.m.
- Confirmation Hearing: May 14, 2013
- Confirmation Objection Deadline: May 7, 2013 at 4:00 p.m.

86.    Further, the Debtor files the Scheduling Motion in order to minimize the burdens on parties with respect to both noticing and scheduling of hearing for regular motions and other routine matters likely to be presented to this Court. Scheduling regular omnibus hearings so that all motions may be heard at one time, and out of town parties may make appropriate travel arrangements to attend such hearings, is appropriate in this case in order to conserve the resources of both the Debtor and the Court. Accordingly, I submit that the Scheduling Motion is in the best interests of the Debtor, its estate, creditors and other parties in interest.

**J. Insurance Motion**

87.    By the Insurance Motion, the Debtor seeks entry of an order by this Court authorizing, but not directing, the Debtor to maintain existing insurance policies and to pay all outstanding pre-petition insurance premiums (collectively, the "Insurance Obligations"). The Debtor also requests that financial institutions be directed to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the Insurance Policies, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date. The Debtor further requests that all such financial institutions be authorized to rely on the Debtor's designation of any particular check or electronic payment request as appropriate pursuant to the Insurance Motion.

88.     It is critical that the Debtor be allowed to pay its Insurance Obligations on an ongoing and uninterrupted basis.  Failure to maintain its Insurance Programs could result in attempts by the Debtor's insurance companies to terminate or decline to renew the Insurance Policies, or refusal to enter into new insurance policies with the Debtor in the future.  If any of the Insurance Programs are discontinued, the Debtor could be exposed to substantial liability, to the detriment of all interested parties.  Accordingly, I submit that granting the relief sought in the Insurance Motion is in the best interests of the Debtor, its estate, creditors and other parties in interest.

### J.   Interim Compensation Motion

89.     Pursuant to the Interim Compensation Motion, the Debtor seeks an order from the Court that authorizes and establishes procedures for the compensation and reimbursement of court-approved professionals (the "Professionals") on a monthly basis, on terms comparable to those procedures recently established in other Chapter 11 cases in this District. In short, the requested procedures will permit each Professional subject to these procedures to present a statement of services rendered and expenses incurred by the Professional for the prior month to the following parties: (a) the Debtor; (b) the Office of the United States Trustee for the Eastern District of Virginia; (c) counsel for UMB Bank, N.A., the master and bond trustee; (d) the Debtor's debtor in possession lender; and (e) any appointed creditors' committee.  If there is no timely objection, the Debtor will pay eighty-five percent (85%) of the amount of fees incurred for the month, with a fifteen percent (15%) holdback, and one hundred percent (100%) of expense disbursements for the month.  These payments will be subject to the Court's subsequent approval as part of the normal interim fee application process approximately every 120 days.

90.    An order from the Court granting the relief requested on the Interim Compensation Motion will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in this Chapter 11 case more effectively.  Accordingly, I submit that granting the relief sought in the Interim Compensation Motion is in the best interests of the Debtor, its estate, creditors and other parties in interest.

### K.    Claims Agent Application

91.    Pursuant to the Claims Agent Application, the Debtor seeks authorization to retain BMC Group, Inc. ("BMC") as its claims, noticing and solicitation agent ("Agent").  Upon information and belief, BMC is an experienced Agent and is frequently used by debtors in large Chapter 11 cases, and I believe BMC is well qualified to provide such services, expertise, consultation, and assistance to the Debtor and serve as Agent in this Chapter 11 case.  The Debtor believes that BMC is capable of handling the requisite noticing responsibilities, thereby relieving the Clerk, or in the alternative, the Debtor, of such burden and expense.  The employment of BMC will provide efficient management of the claims and noticing processes in this case, thereby allowing the Debtor's management and advisors to focus on the Debtor's reorganization efforts for the benefit of the Debtor, its estate and its creditors.

### L.    DLA Retention Application

92.    The Debtor requests an order authorizing it to employ and engage DLA Piper LLP (US) ("DLA Piper") as attorneys for the Debtor effective nunc pro tunc to the Petition Date.

93.    The Debtor selected DLA Piper because its attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights, and, in addition to a national bankruptcy practice, have extensive experience with the bankruptcy courts in various jurisdictions.  Moreover, DLA Piper has significant experience, both in and out of court, with respect to continuing care retirement community restructurings.  Indeed, among other cases,

DLA Piper represented the debtors in the following continuing care retirement community Chapter 11 cases: In re The Clare At Water Tower, Case No. 11-46151 (Bankr. N.D. Ill.); In re Linden Ponds, Inc. et al., Case No. 11-33912 (Bankr. N.D. Tex.); In re Sedgebrook, Inc., Case No. 10-34178 (Bankr. N.D. Tex.); In re Monarch Landing, Inc., Case No. 10-34179 (Bankr. N.D. Tex.); In re Erickson Retirement Cmtys., LLC et al., Case No. 09-37010 (Banker. N.D. Tex.). DLA Piper has the ability to commit substantial resources to legal problems on an urgent basis. The Debtor, therefore, believes that DLA Piper is well qualified to represent it in this Chapter 11 case.

94.    In assisting the Debtor with the filing of this Chapter 11 case, and as a result of DLA Piper's pre-petition representation of the Debtor, DLA Piper's attorneys have become familiar with the complex factual and legal issues that will have to be addressed in this Chapter 11 case. The retention of DLA Piper, with its knowledge of and experience with the Debtor, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

95.    The Debtor believes that the employment of DLA Piper would be in the best interests of the Debtor and its estate and desires to employ DLA Piper, effective on the Petition Date, with compensation to be determined upon application to this Court.  Were the Debtor required to engage counsel other than DLA Piper in connection with this case, the Debtor, its estate, and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtor's business and financial affairs.

**M.  Hirschler Fleischer Retention Application**

96.    The Debtor requests an order authorizing it to employ and engage Hirschler Fleischer, P.C. ("Hirschler Fleischer") as attorneys for the Debtor effective nunc pro tunc to the Petition Date.

97.     The Debtor selected Hirschler Fleischer because its attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights, and, in addition to a national bankruptcy practice, have extensive experience with the bankruptcy courts in various jurisdictions. The Debtor, therefore, believes that Hirschler Fleischer is well qualified to represent it in this Chapter 11 case.

98.     In assisting the Debtor with the filing of this Chapter 11 case, and as a result of Hirschler Fleischer's pre-petition representation of the Debtor, Hirschler Fleischer's attorneys have become familiar with the complex factual and legal issues that will have to be addressed in this Chapter 11 case. The retention of Hirschler Fleischer, with its knowledge of and experience with the Debtor, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

99.     The Debtor believes that the employment of Hirschler Fleischer would be in the best interests of the Debtor and its estate and desire to employ Hirschler Fleischer, effective on the Petition Date, with compensation to be determined upon application to this Court. Were the Debtor required to engage counsel other than Hirschler Fleischer in connection with this case, the Debtor, its estate, and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtor's business and financial affairs.

**N.  McGuireWoods Retention Application**

100.    By the McGuireWoods Retention Application, the Debtor requests authorization to employ and retain McGuireWoods LLP ("McGuireWoods") as special bond counsel nunc pro tunc to the Petition Date. Prior to the Petition Date, the Debtor retained McGuireWoods to, among other things, assist the Debtor in connection with the issuance of the Bonds. In such

capacity, McGuireWoods became familiar with the Debtor's business operations, financial affairs, and capital structure.

101.    In assisting the Debtor with the original issuance of the Bonds, McGuireWoods' attorneys have become familiar with the complex factual and legal issues that will have to be addressed with respect to the issuance of the new bonds proposed under the Plan. The retention of McGuireWoods, with its knowledge of and experience with the Debtor, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

102.    The Debtor believes that the employment of McGuireWoods would be in the best interests of the Debtor and its estate and desire to employ McGuireWoods, effective on the Petition Date, with compensation to be determined upon application to this Court. Were the Debtor required to engage counsel other than McGuireWoods in connection with this case and the issuance of new bonds under the Plan, the Debtor, its estate, and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtor's business and financial affairs.

**O.  Deloitte Retention Application**

103.    By the Deloitte Retention Application, the Debtor requests authorization to employ and retain Deloitte Financial Advisory Services LLP ("Deloitte") as restructuring advisor nunc pro tunc to the Petition Date. Prior to the Petition Date, the Debtor retained Deloitte to, among other things, assist the Debtor in connection with its financial restructuring process. In such capacity, Deloitte became familiar with the Debtor's business operations, financial affairs, and capital structure.

104.    The Debtor believes that the terms of Deloitte's retention are fair and reasonable and that Deloitte is both well-qualified and uniquely-suited to deal effectively and efficiently with matters that may arise in the context of this Chapter 11 case. I believe that the relief

requested in the Deloitte Retention Application is essential, appropriate, and in the best interest

of the Debtor's estate and creditors, and therefore, should be approved.

For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions. I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

I declare under the penalty of perjury that the foregoing is true and current.

Dated: March 1, 2013

By: Christopher Henderson

Title: President